| | |
|---|---|
| JUDICIAL ARBITER GROUP, INC. | JAG Case No. 2022-0364A |
| LE'ONSHA SCOTT,<br>　　　　Claimant,<br>v.<br>ELLEN CAHILL,<br>　　　　Respondent. | DATE FILED: June 29, 2022 5:45 PM<br>FILING ID: 7B89AB32BC4EA<br>CASE NUMBER: 2021CV30220 |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND AWARD IN ARBITRATION

Pursuant to the parties' arbitration agreement, an arbitration trial of this personal injury case was held before Judge Richard B. Caschette at the Denver offices of the Judicial Arbiter Group, Inc. on May 5, 2022. The Claimant Le'Onsha Scott ("claimant," "Plaintiff," or "Ms. Scott") was represented by her attorneys Richard. M. Crane and Ben Norton. Respondent Ellen Cahill ("Cahill") was represented by Brendan F. Friedman (Lasater & Martin, P.C.).

Plaintiff's Exhibits 1-32, along with Defendant's Exhibits A-M, were admitted into evidence without objection. Having considered the testimony of the Claimant and her husband Jeffrey Scott, exhibits admitted into evidence, and the arguments of counsel, the Arbiter makes the followings FINDINGS and ORDERS:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ms. Scott, along with her husband Jeffrey Scott, testified on behalf of Ms. Scott. Ms. Cahill did not present any witnesses, take any depositions, or endorse any experts in this matter. The Arbiter found both of the Scotts to be generally credible, however, it was difficult for the Arbiter to reconcile Ms. Scott's physical presentation at the arbitration with Dr. Bess's recent findings that Ms. Scott's preoperative symptoms and operative pain were gone and she had full range of motion.

Claimant Le'Onsha Scott was born September 9, 1986, and is 35 years of age. As of the date of the arbitration trial, she had a life expectancy of 43.8 years. Ex. 27. She is a high school

graduate, and she has primarily worked in customer service. She is married, and has four children, 6-year-old twins, along with an 11-year-old and a 15-year-old.

On April 27, 2018, Ms. Scott and Ms. Cahill were both driving northbound on Tower Road near the intersection with 44th Ave. Ms. Scott was in the right lane and Ms. Cahill was in the left lane. Ms. Cahill swerved into Ms. Scott's lane, colliding with the left side of Ms. Scott's vehicle. Ms. Cahill stipulated that she was negligent in the motor vehicle collision and that Ms. Scott was not comparatively negligent. Ms. Scott's vehicle was a total loss. Ex. 16.

As liability is not in dispute, the only issue for determination is whether Scott sustained injury in the accident, and the nature and extent of her damages. "Noneconomic loss or injury" is defined as nonpecuniary harm including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life. § 13-21-102.5(2)(b). The terms "physical impairment" and "disfigurement" are not expressly defined in section 13-21-102.5 or in any appellate decision. *But see Pringle v. Valdez*, 171 P.3d 624, 631 (Colo. 2007) ("If someone tortiously inflicts a permanent injury on another, he or she has taken away something valuable which is independent and different from other recognized elements of damages such as pain and suffering and loss of earning capacity." (*quoting* Marilyn Minzer et al., *Damages in Tort Actions* § 12.02 (1992*))*; *Preston v. Dupont*, 35 P.3d 433, 441 (Colo. 2001) ("Recovery for [physical impairment] at common law thus flowed from the general principle that whoever unlawfully injures another shall make her whole."). Medical expenses are compensable to the extent they are reasonable in amount as well as necessary. *Kendall v. Hargrave*, 142 Colo. 120, 349 P.2d 993 (1960); *Oliver v. Weaver*, 72 Colo. 540, 212 P. 978 (1923); *Denver City Tramway Co. v. Hills*, 50 Colo. 328, 116 P. 125 (1911). Most

significantly, the plaintiff has the burden of proving, by a preponderance of the evidence, the damages were caused by the defendant's negligence. CJI-Civ 6:1.

Both Ms. Scott and Ms. Cahill called the police from the accident scene. However, the police never showed up due to a shooting that occurred nearby on the same day. Ms. Scott testified that she was kind of "out of it" after the collision and may have lost consciousness. Ms. Cahill admitted fault for the collision at the scene. Ms. Scott immediately experienced severe headaches and neck pain. When that pain did not dissipate, she went to the University Hospital Emergency Room approximately 48 hours later. At the emergency room, her providers focused on ruling out a spinal fracture. Ex. 11. X-rays of Ms. Scott's spine were negative, and she was instructed to follow up with her primary care provider. Ms. Scott's primary care physician referred her to Injury Rehabilitation Specialists. This began a lengthy course of treatment, which is still ongoing.

In Ms. Scott's initial examination at Injury Rehab, she complained of radiating pain at her knee. Ex. 6, SCO000037. This pain could reach 10/10. *Id.* During a physical examination during that visit, her providers also noted decreased flexion and pain in her right knee. *Id.* at SCO000039. At her very first physical therapy session, her physical therapist noted swelling in her right knee. *Id.* at SCO000064. During her first follow-up appointment, her provider noted that "her right knee is edematous, ecchymotic and painful to touch." *Id.* at SCO000041. That same visit, she was diagnosed with a contusion in her knee, along with edema and pain in the back of her knee. *Id.* Therefore, Tara Luke, FNP, ordered an MRI of Ms. Scott's right knee, which was performed on June 4, 2018. Ex. 2, SCO000007. At the same time, Ms. Scott underwent several months of

3

undergoing arthroscopic surgeries on both knees at the same time. *See* Ex. 8, SCO000179. However, because she has four children at home, Ms. Scott opted to have her right knee done first, before proceeding with the left knee. Dr. Bess performed the first knee surgery on October 31, 2018. *Id.* at SCO000197-198. This was an arthroscopic surgery with a patellar chondroplasty, aimed at repairing the tissue behind Ms. Scott's patella that was damaged in the collision. *Id.* Ms. Scott was placed under general anesthesia. *Id.* Following that procedure, Dr. Bess directed Ms. Scott to undergo a course of physical therapy with Quality Health physical therapy.

After Ms. Scott's symptoms improved in her right knee, Dr. Bess recommended that they proceed with a similar arthroscopic surgery on her left knee. *Id.* at SCO000176. Ms. Scott testified that it was difficult for her to find a time that she could take several weeks off to recover, so she delayed that surgery until June 18, 2019. *Id.* at SCO000191-3. The procedures performed were similar to the first surgery, but on the left knee. *Id.* These procedures again focused on repairing and reshaping the cartilage behind Ms. Scott's patella. *Id.* Following that surgery, Dr. Bess recommended another course of physical therapy at Quality Health.

Ms. Scott testified that each of the first two surgeries provided some relief. However, by the fall of 2019, she began to experience recurrent right knee pain when walking up or down stairs. Therefore, she returned to see Dr. Bess on December 16, 2019. *Id.* at SCO000211. Dr. Bess ordered an updated MRI of her right knee, which revealed recurrent patellar chondromalacia. *Id.* at SCO000210; Ex. 4, SCO0000026. Based on his review of the imaging, Dr. Bess recommended a repeat arthroscopic surgery and chondroplasty. Ex. 8, SCO000210. Ms. Scott testified that this surgery was delayed due to Covid, but eventually scheduled for May 19, 2020. *Id.* at SCO000223-000224. This procedure was virtually identical to the first - an arthroscopic surgery and chondroplasty aimed at repairing the damaged cartilage at Ms. Scott's patellofemoral joint. *Id.*

After completing physical therapy, Ms. Scott's right knee pain improved significantly. However, she began to experience recurrent pain in her left knee. Dr. Bess ordered a repeat MRI of her left knee. Ex. 4, SCO000023-24. Dr. Bess reviewed that imaging, which revealed persistent patellofemoral chondromalacia. Ex. 17, SCO000492. Dr. Bess performed a repeat arthroscopic surgery on November 30, 2021. *Id.* at SCO000522-524. Unfortunately, a piece of hardware got stuck in Ms. Scott's knee, which necessitated a follow-up procedure to remove. *Id.* at SCO000518-19. This follow-up procedure required Dr. Bess to create a large incision in the back of Ms. Scott's left knee. This resulted in a large scar, which Ms. Scott showed during the arbitration hearing.

Dr. Bess last saw Ms. Scott on April 6, 2022. At that time, her preoperative symptoms and operative pain were gone. She had a full range of motion.

Ms. Scott testified that she never experienced any pain in either knee prior to the motor vehicle collision. This is confirmed by her medical records, which do not include knee pain prior to this collision. She is still recovering from her most recent surgery. She testified that she expected to be discharged by Dr. Bess at her most recent appointment with him, but he scheduled a follow-up appointment for next month to monitor her lingering symptoms.

Dr. Bess drafted a narrative report, dated July 23, 2020, and issued an update to that narrative report on April 6, 2022. Ex. 13 and 26. Prior to drafting that narrative, Dr. Bess reviewed his own records, all imaging studies performed on Ms. Scott, and all other medical records that were submitted in this arbitration. Ex. 13 and 26. He noted several injuries and symptoms that he attributes to the motor vehicle collision, including, bilateral patellar chondral injuries; cervical spine myofascial strain; a head injury; thoracolumbar injuries; right calcaneus contusion; bilateral shoulder injuries; and a left index finger injury. Ex. 13, SCO000417-418. Dr. Bess opined that each of these injuries, including all five surgeries, were causally related to the car crash. *Id.* at 418. This opinion is based on a differential diagnosis. *Id.* Dr. Bess opined that there are biologically

6

plausible links between Ms. Scott's symptoms and diagnoses, and the trauma from the motor vehicle collision. *Id.* He then noted that there is a close temporal relationship these injuries and symptoms and the motor vehicle collision. *Id.* Ms. Scott complained of knee pain in her very first visit with Injury Rehabilitation Specialists, and her physical therapist noted that her knee was bruised and swollen during her first physical therapy session. Ex. 6, SCO000037, 64 Finally, Dr. Bess stated that there are no other plausible explanations for the symptoms and diagnoses. Ex. 13, SCO000418. He reached these opinions after treating the patient, and reviewing all medical records and imaging studies that were admitted into evidence in the arbitration. He ruled out all other causes of these injuries or symptoms, including any unrelated degenerative conditions. This analysis by a medical doctor is reliable under C.R.E. 702.

Dr. Bess also opined that Ms. Scott's "injuries are permanent in nature and with a reasonable degree of medical probability will continue into the future." Ex. 26, SCO000570. He stated that Ms. Scott suffered physical impairment as a result of the collision. Ex. 26, SCO000571. He stated that Ms. Scott suffered disfigurement as a result of her injuries and treatment. *Id.* at SCO000570. He noted that Ms. Scott is still undergoing treatment for her lumbar pain, in which she suffered disc herniations at L4-5. Ms. Scott testified that Dr. Bess has placed her under several restrictions, including avoiding sitting or standing or too long, or engaging in any lengthy activities that require her to be on her feet. She testified that she experiences pain very quickly upon engaging in these sorts of activities. Dr. Bess made future recommendations for Ms. Scott, including possible additional knee surgeries or Platelet-rich-plasma (PRP) injections if her recurrent chondromalacia returns. *Id.* She may also need back surgery if her symptoms do not improve. *Id.*

In his Declaration, Dr. Bess reviewed all of Plaintiff's medical bills, and opined that the medical treatment associated with that treatment is reasonable, necessary, and causally related to

7

the motor vehicle collision. *Id.* at SCO000558. He also stated that the amount of those medical expenses was reasonable and customary. *Id.* Those bills total $113,758.68. Ex. 24.

Ms. Scott also testified extensively regarding how her injuries have impacted her life. She had to go under general anesthesia for each of her five surgeries. She testified that she feared she would never wake up from one of those surgeries, and had to speak to her children about the possibility that she would die during surgery. The surgeries prevented her from working during each recovery period, which lasted about 6-8 weeks after each surgery. The first few weeks of each recovery period were particularly difficult for her, when she was not mobile at all. This impacted every aspect of her life. She testified that she was reduced to sitting and watching, rather than participating in life with her family. This was discouraging for her, as well as for her family. She admitted to becoming depressed, and feeling that she has become a burden to her family.

She testified that her symptoms have not completely resolved. She recently took the children to a flea market, but had to leave after only 30 minutes because the pain of standing and walking became too much for her.

Ms. Scott testified that throughout her four-year course of treatment, she continually attempted to work each time that Dr. Bess advised her that it was safe for her to do so. She was last employed in November of 2021 with a temp service providing customer service for Kaiser, earning $22 per hour. She left that job in order to undergo her fourth and fifth surgeries. Since her recovery from those surgeries, she has attempted to find a new job, but it has been difficult to find work that accommodates her restrictions, which include not sitting or standing for too long.

Ms. Scott's husband, Jeffrey Scott, also testified during the arbitration trial. Mr. Scott testified that he works the graveyard shift at the U.S. mint as a metal machine operator. His work schedule made Ms. Scott's recovery even more difficult, but they did not have a choice. Prior to this collision, they were a two-income household, but now they have to rely entirely on him. He

8

has taken on greater responsibilities at home because Ms. Scott has been unable to take care of the children or perform household chores due to her injuries. They used to play sports, race with their children, or walk to the park near their home. They haven't been able to do any of those things since the collision, and he is actively looking for a second job to help make ends meet.

Ms. Cahill did not testify or call any witnesses. She did not submit any discovery requests, take any depositions, or endorse any experts.

## ARBITRATION AWARD

In light of the foregoing, I find that Ms. Scott proved past economic damages in the amount of $113,759 for her medical expenses, as supported by Dr. Bess' opinions as well as her testimony. Ex. 24. Respondent did not provide any opinions or testimony to rebut this. Further, Ms. Scott's recovery from her surgeries and the restrictions imposed by Dr. Bess resulted in lost wages. Ms. Scott testified that she most recently earned $22 per hour, which would yield an annual salary of $44,000.00. She testified that she most recently worked in November of 2021 before her fourth surgery, and has had difficulty finding work that will accommodate her restrictions. Respondent did not introduce any testimony to rebut this. Therefore, I find that she has proven past lost wages in the amount of $17,600.00, which represents the 5 months that she has been unable to work since the most recent surgery.

In addition, Claimant proved that she suffered physical impairment and disfigurement. Dr. Bess opined that Ms. Scott has sustained physical impairment. Ms. Scott also testified that Dr. Bess has placed her under restrictions not to stand, sit, or walk for prolonged periods of time. Respondent did not offer any testimony to rebut this. Therefore, I find it reasonable to award her $5 per day for physical impairment. This results in an additional award of $79,935.00. Furthermore, Claimant demonstrated 3 surgical scars in the front of each knee, as well as a large scar running across the back of her left knee. The Arbiter awards Ms. Scott $10,000 for disfigurement.

I also find that Ms. Scott has proven that she suffered non-economic losses. As a result of her injuries, she underwent 5 surgeries. Each of these surgeries required her to undergo general anesthesia. Each required months of rehabilitation. She testified that her mobility was greatly restricted during this time. Dr. Bess opined that she requires future treatment, and Ms. Scott testified that she believes that her symptoms will never completely resolve. Ex. 26. The Arbiter awards Ms. Scott $100,000 in non-economic damages.

Thus, I find that the Respondent was negligent as stipulated by the parties. I award Claimant $131,359 in past and future economic losses; $89,935 in past and future physical impairment and disfigurement; and $100,000 in past and future non-economic losses. Therefore, I award Claimant a total of $321,294.

Dated: May 24, 2022

Hon. Richard B. Caschette (Ret.)
Arbiter

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May, 2022, a true and correct copy of the foregoing *Award* was served via electronic filing (*File & ServeXpress*), addressed to the following:

All Counsel of Record

Original Signature on File
Leah McGirr, Administrative Clerk
Judicial Arbiter Group, Inc.
